UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ALLOC, INC., BERRY FINANCE, N.V. and     :
VALINGE ALUMINIUM AB,                     :
                              Plaintiffs,  :          03 Civ. 4419 (PAC)
                                          :
    -   against -                         :          OPINION & ORDER ON
                                          :          CLAIM CONSTRUCTION
NORMAN D. LIFTON CO., BALTA U.S., INC.    :
and BALTERIO, N.V.,                       :
                              Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiffs Alloc Inc. ("Alloc"), Berry Finance N.V. ("Berry"), and Valinge

Innovation AB, formerly Valinge Aluminium AB ("Valinge") bring this action against

Defendants Norman D. Lifton Co. ("Lifton"), Balta U.S. Inc. ("Balta"), and Balterio,

N.V. ("Balterio"), alleging infringement of claims 10, 13-15, 22, 23, and 25-27 of U.S.

Patent No. 6,516,579 (the "'579 patent"), claims 1-4 of U.S. Patent No. 6,023,907 (the

"'907 patent"), and claims 21, 31, 32, 35 and 40 of Reissued U.S. Patent No. 5,706,621

(the "'621 reissue patent").  The parties now move for claim construction under Markman

v. Westview Instruments, Inc., 517 U.S. 370 (1996), and have extensively briefed the

meaning of the relevant claim terms.  On November 29, 2006, the parties set forth their

positions in further detail at a Markman hearing before the Court.  The parties have also

submitted proposed claim constructions.   Having carefully considered the parties'

submissions, the Court now construes the relevant claim language as set forth below.

## BACKGROUND[1]

Valinge, a Swedish corporation, is the assignee of the three patents at

---

[1] All facts are derived from the parties' evidentiary submissions and the published decisions of the Federal
Circuit, and are undisputed unless otherwise indicated.

issue, which are part of a patent family covering a method for assembling floor panels invented by Tony Pervan (the "Pervan patents"). The patent family originates from a 1993 Swedish patent application by Valinge, which was the basis for the priority claim of a 1994 Patent Cooperation Treaty ("PCT") application. The PCT application was in turn the basis for five U.S. patents; the '621 patent being the U.S. parent. The specification and drawings are functionally identical in all of the U.S. patents. Berry, a Belgian corporation, is the exclusive licensee of the patents, and Alloc is a U.S. affiliate of Berry and sub-licensee of the patents. Balterio, a Belgian corporation, manufactures "Click-Xpress" floor panels that allegedly infringe the patents, and Lifton and Balta are U.S. corporations selling those panels in this country.

## I. General Principles of Claim Construction

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotations and citations omitted). The claim terms are generally given their "ordinary and customary meaning," which is the meaning they would have "to a person of ordinary skill in the art in question at the time of the invention" who has read them in "the context of the entire patent, including the specification." Id. at 1312-13 (citations omitted).

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges" and claim construction may be accomplished by "the application of the widely accepted meaning of commonly understood words," with the aid of a general purpose dictionary, if necessary. Id. at 1314. For more complicated claims, a court first considers whether the meaning of

the terms is revealed by intrinsic evidence: the claim language as a whole, the specification, and the patent prosecution history.  As to claim language, the context in which a term is used within the claim can provide "a firm basis for construing the claim" and the meaning of terms will normally be consistent across different claims in a patent. Id.  Similarly "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." Id. at 1315.

Notwithstanding the usefulness of the claim language standing alone, the specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Moreover, the inventor may use the specification to give a special definition to claim terms distinct from their ordinary meaning, or to disclaim or disavow potential claim scope. Phillips, 415 F.3d at 1316.  In such cases the inventor's intention to define or disclaim must be clearly expressed in the specification. Conoco, Inc. v. Energy & Environmental Intern., L.C., 460 F.3d 1349, 1357-58 (Fed. Cir. 2006).  While the specification is helpful in understanding the meaning of the claim terms, the court may not simply import limitations into the patent claims from the specification, particularly based on a preferred embodiment or embodiments. See id.; see also Phillips, 415 F.3d at 1323.  The prosecution history is also relevant evidence of the meaning of the claim terms, but it is more ambiguous and therefore less useful than the specification due to the unfinished nature of the negotiation it records.  Its primary value to the court is to allow the exclusion of "any interpretation

that was disclaimed during prosecution." <u>Chimie v. PPG Industries, Inc.</u>, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (internal quotation omitted).

Where the intrinsic evidence is not conclusive, the court may consider extrinsic evidence such as expert testimony, dictionaries and learned treatises. <u>Phillips</u>, 415 F.3d at 1317. Such evidence may be useful in educating the court as to the underlying technology and to the understanding given certain terms in the relevant technological field. It is, however, less reliable than intrinsic evidence, and should be considered only with caution and in the context of the intrinsic evidence. In particular, "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." <u>Id.</u> at 1318.

## II. The Claims at Issue

At the <u>Markman</u> hearing, the parties informed the Court that various disputes over claim language had been resolved. The remaining claims containing language that is in dispute are claims 10 and 22 of the '579 patent, claim 1 of the '907 patent and claims 21 and 31 of the '621 reissue patent.

Claim 10 of the '579 patent reads:

A mechanical locking system for locking a first edge of a first panel to a second edge of an identical second panel, the mechanical locking system comprising:
a tongue and groove on the first edge and the second edge forming a first mechanical connection locking the first and second edges to each other in a first direction at right angles to a principal plane of the panels;
a locking device arranged on an underside of the first and the second edges, the locking device forming a ***second mechanical connection*** locking the first and the second edges to each other in a second direction parallel to the principal plane and at right angles to the edges;
the locking device including a locking groove which extends parallel to and spaced from the second edge, the locking groove being

open at the underside of the second edge and including an ***internal surface***;

the locking device further including a strip extending from the first edge, the strip extending throughout substantially an entire length of the first edge and being provided with a ***locking element projecting from the strip***;

the strip, the locking element, and the locking groove being configured such that when the second edge is pressed against an upper part of the first edge and is then angled down, the locking element can enter the locking groove;

the locking element has a ***locking surface which faces the first edge*** and is configured so as to contact the internal surface of the locking groove when the first and second edges are joined together ***to prevent substantial separation of the joined first and second edges***;

and the locking element further including an outer portion which is most distant to the joined edges and is not in contact with the locking groove when the first and second edges are joined together.

'579 patent, col. 11-12 (emphasis added to disputed terms).

Claim 22 reads:

A floating laminate floor board including an ***upper decorative wear layer***, a core layer arranged beneath the upper decorative wear layer, the core layer being made of a material that is not as hard as the upper decorative wear layer, a base layer beneath the core layer, and a mechanical locking system for locking a first edge of a first floor board to a second edge of an identical second floor board, the mechanical locking system comprising:

a tongue and groove on the first edge and the second edge forming a first mechanical connection locking the first and second edges to each other in a first direction at right angles to a principal plane of the floor boards, the tongue and groove being formed in the material of the core layer; and

a locking device arranged on an underside of the first and the second edges, the locking device forming a ***second mechanical connection*** locking the first and the second edges to each other in a second direction parallel to the principal plane and at right angles to the edges, wherein the locking device includes a locking groove which extends parallel to and spaced from the second edge, the locking groove being open at the underside of the second edge and including an ***internal surface***,

wherein the locking device further includes a strip extending from the first edge, the strip extending throughout substantially an entire length of the first edge and being provided ***with a locking element projecting from the strip***,

wherein the strip, the locking element, and the locking groove are configured such that when the second edge is pressed against an upper part of the first edge and is then angled down, the locking element can enter the locking groove, and

wherein the locking element has *a locking surface which faces the first edge* and is configured so as to contact the internal surface of the locking groove *to prevent substantial separation of the joined first and second edges*.

'579 patent, col. 13 (emphasis added to disputed terms).

Claim 1 of the '907 patent reads:

A method of laying and mechanically joining floor panels in parallel rows, wherein relative positions of the panels during the method can be defined as including first and second mutual positions, a first mutual position in which (i) the two panels are held in an angled position relative to each other and (ii) upper portions of adjacent edges of the two panels are in mutual contact, and a second mutual position in which the two panels are (i) located in a common plane, (ii) mechanically locked to each other in a first direction that is at right angles to the common plane, (iii) mechanically locked to each other in a second direction, that is at right angles to said first direction and to the adjacent joint edges, as a result of a *first locking member* disposed at one of the adjacent edges being connected to a *second locking member* disposed at the other one of the adjacent edges, and (iv) being displaceable in relation to each other in the direction of the adjacent joint edges, wherein said method comprises the steps of:

(a) bringing a new one of the panels into an intermediary position where (i) a previously laid first one of the panels is located in a first row, (ii) a second one of the panels is located in a second row and is in said first mutual position in relation to the first panel, and (iii) the new panel is located in the second row and is in said second mutual position in relation to the second panel and is in a position relative to the first panel such that a mutual distance is present between the upper portions of the adjacent joint edges of the new panel and the first panel;

(b) while maintaining said second mutual position between the new panel and the second panel, displacing the new panel relative to the second panel into said first mutual position in relation to the first panel; and

(c) angling the new panel and the second panel together into said second mutual position in relation to the first panel.

'907 patent, col. 10 (emphasis added to disputed terms).

6

Claim 21 of the '621 reissue patent reads:

A system for providing a joint between adjacent building panels, comprising:

each of said building panels including a first edge and a second edge such that the first edge of each of said building panels forms a first mechanical connection with the second edge of an adjacent one of the building panels locking the first and second edges of the building panels to each other in a first direction at right angles to a principal plane of the panels, and

a locking device arranged on a rear side of the building panels forming a ***second mechanical connection*** locking the building panels to each other in a second direction parallel to the principal plane and at right angles to the first and second edges, said locking device fitting within a locking groove extending parallel to and spaced apart from the first edge of said building panels, and which locking groove is open at the rear side of the building panels,

the locking device comprising a strip integrally formed with the second edge of each of said building panels, said strip extending throughout substantially an entire length of the second edge and being provided with ***a locking element projecting from the strip***, such that when two adjacent building panels are joined together, the strip projects from the rear side of the second edge of the panels with its locking element received in the locking groove of an adjacent building panel,

the first and the second mechanical connections both allow mutual displacement of the building panels in a direction of the first and second edges, and

the ***second mechanical connection*** enables the locking element to leave the locking groove if the respective building panel is turned about its first edge angularly away from the strip.

'621 reissue patent, col.12 (emphasis added to disputed terms).

Finally, claim 31 of the '621 reissue patent reads:

A system for providing a joint between adjacent building panels, comprising:

each of said building panels including a first edge and a second edge such that the first edge of each of said building panels forms a first mechanical connection with the second edge of an adjacent one of the building panels locking the first and second edges of the building panels to each other in a first direction at right angles to a principal plane of the panels, and

a locking device arranged on a rear side of the building panels forming a ***second mechanical connection*** locking the building panels to each other in a second direction parallel to the principal plane and at right

angles to the first and second edges, said locking device fitting within a locking groove extending parallel to and spaced apart from the first edge of said building panels, and which locking groove is open at the rear side of the building panels,

the locking device comprising a strip formed at the second edge of each of said building panels, said strip extending throughout substantially an entire length of the second edge and being provided with *a locking element projecting from the strip*, such that when two adjacent building panels are joined together, the strip projects from the rear side of the second edge of the panels with its locking element received in the locking groove of an adjacent building panel, and

the locking groove and the locking element being dimensioned such that when adjacent panels are joined together and the locking element is received within the locking groove, there is *sufficient space within the locking groove* to allow mutual displacement of the adjacent panels in a direction of the first and second edges and to enable the locking element to leave the locking groove if the respective building panel is turned about its first edge angularly away from the locking strip

Prosecution History of Reissue of '621 Patent ("PH"), 621-RI-127 (emphasis added to disputed terms).

### III. The Federal Circuit's Decision in <u>Alloc v. ITC</u>

In <u>Alloc v. ITC</u>, 342 F.3d 1361 (Fed. Cir. 2003), the Federal Circuit considered certain of the claim construction issues raised here. On appeal from a ruling by the International Trade Commission ("ITC"), the Federal Circuit construed, <u>inter alia</u>, claim 1 of the '907 patent and claim 21 of the original '621 patent.[2] In particular, the court ruled that all the Pervan patents incorporated the element of "play" in the claimed mechanism for holding floor panels together, regardless of whether that term was included in particular claim language. <u>Alloc</u>, 342 F.3d at 1370-73. The court based this determination on both the common Pervan patent specification and the prosecution history of the '621 patent. The court defined "play" as "a space between a locking

---

[2] The <u>Alloc</u> court also considered similar language in the two Pervan patents not asserted in the present action: U.S. Patent Nos. 6,182,410 ("'410 patent") and 5,860,267.

groove on a first panel and the locking element of a panel adjacent to the first panel." Id. at 1367.

According to the Alloc court, the specification "read as a whole leads to the inescapable conclusion that the claimed invention must include play in every embodiment." Id. at 1370.  This conclusion was based on the following findings:

(1) the "Technical Problems and Objects of the Invention" section of the specification describes the invention as including play;

(2) the specification teaches that play between the components of the locking mechanism is what permits displacement of connected panels, permitting disassembly and reassembly;

(3) The specification criticizes prior art floor systems without play; and

(4) All figures and embodiments imply or expressly disclose play.

Id. at 1369-70.  The court stated explicitly that "the specification alone is sufficiently clear" so as to require that the Pervan patent claims be construed as including play. Id. at 1371.

The court also found an independent justification for such a construction in the original prosecution history of the '621 patent.  The court found that the original PCT application included the element of play, and that the International Preliminary Examination Committee found it to be novel on that basis. Id.  The Court further found that Plaintiffs gained allowance of the '621 patent over an initial rejection for obviousness in light of U.S. Patent No. 4,819,932 ("Trotter") by distinguishing the '621 patent based on the displacement and disassembly features enabled by play. Id. at 1371-72.  After gaining allowance of its initial claims 1-20 based on play in the '621 patent, the

Plaintiffs added new, nearly identical claims 21-23 that did not specifically mention play. Id. at 1372. The Court found that Plaintiffs did not "retract or modify the original representations that secured allowance of the original claims" and indeed acknowledged that the new claims "did not define the play *that exists*." Id. (quoting prosecution history) (emphasis added).  In light of this prosecution history, the Court found that the Plaintiffs "expressly disavowed systems without play during prosecution of the parent '621 application." Id.  The court further ruled that this disavowal was attributable to the "child" patents following the '621 patent, as they also included the same critical features of the '621 patent: "locking members, locking elements, or locking means that permit displacement of panels or release of panels during disassembly. Specifically, the asserted [claims] require the displacement of floor panels, or floor panels that are displaceable in relation to each other." Id.

## IV.  The '621 Patent Reissue/Reexamination

On June 30, 1999, less than two years after the '621 patent was originally issued, Valinge applied to the United States Patent and Trademark Office ("Patent Office") for a broadened reissue of the patent.  The application was supported by Tony Pervan's affidavit claiming the following errors to be correct by the reissue:

> Specifically, Applicant failed to include the subject matter of claims 24-40 which are included in this reissue application.  In one specific example, Applicant failed to include an independent claim, such as claim 31, wherein the locking groove and the locking element are defined as being dimensioned such that when adjacent panels are joined together and the locking element is received within the locking groove, there is sufficient space within the locking groove to allow mutual displacement of the adjacent panels in a direction of the first and second edges and to enable the locking element to leave the locking groove if the respective building panel is turned about its first edge angularly away from the locking strip. In addition, claims 3 and 6 have been amended to eliminate reference numerals.

PH at 621-RI-297. [3]   On July 21, 2000, the assigned Patent Examiner ("Examiner") issued an initial notice of allowability for all 40 claims of the '621 reissue patent, giving the following reasons:

> the prior art of record fails to teach the use of adjacent floor panels being interconnected by locking elements located within a groove formed on the underside of the panels; wherein the displacement of the panels is allowed in a direction of the joint formed between the adjacent panels so as to allow the locking element to be released from the groove when the panel is rotated about the joint formed between adjacent panels.

Id. at 294.   On September 7, 2000, however, the Patent Office ordered re-examination of the '621 patent, and on November 17, 2000 the reissue and reexamination proceedings were merged.

Following the issuance of the Alloc decision on September 10, 2003, Valinge provided the Examiner with a copy of the opinion on October 8, 2003 with the caveat that the court had wrongly construed all the '621 patent claims to require play.   On October 27, 2003, the Examiner relied on the doctrine of obviousness-type double-patenting to reject, inter alia, claims 21 and 31 of the '621 reissue patent as being unpatentable over claims 1 and 2 of the '579 patent.   The Examiner stated that the '621 reissue claims were not patentably distinct from the '579 patent claims because

> each is directed to a system for joining adjacent panels including first and second mechanical connections wherein at least one of the connections include a locking strip and groove wherein the locking groove is formed on an underside of the panel and the panels are joined *such that a play exists between adjacent panels*.

Id. at 140-141 (emphasis added).   To cure the double-patenting rejection, Valinge filed a terminal disclaimer pursuant to 37 C.F.R. § 1.321(c) on January 8, 2004.

---

[3] This claim comes from a supplemental affidavit submitted after the original was found to be insufficient to support reissue.  The original affidavit included only the first and last sentences quoted.  PH at 389.

In its January 8 submission to the Patent Office, Valinge also stated its understanding that claims 21-23 of the original '621 patent had been allowed without any play limitation.  Alluding to the Examiner's double-patenting rejection notice, the <u>Alloc</u> decision, or both, Valinge declared:

> It is Applicant's intention to eliminate any ambiguity or question regarding claims 21-23 with respect to the absence of a play limitation. Therefore, the Applicant understands that the patentability of claims 21-23 is being confirmed in this reissue/reexamination on the basis that those claims do not require play.  If the Examiner's understanding of the scope of claims 21-23…is different from the applicant's intended scope, i.e. as not including a limitation calling for play, Applicant requests that the Examiner so indicate in her reasons for allowance or otherwise.

<u>Id.</u> at 132.  The same request was included in revised submissions on July 2, 2004 and October 4, 2004.

On April 20, 2005, representatives of Valinge met with the Examiner and other Patent Office personnel.[4]  Among the topics discussed was the potential rejection of the '621 reissue claims for obviousness in light of the Trotter prior art.  The Valinge representatives informed the Patent Office personnel that the original '621 patent had already overcome a rejection based on Trotter.  The Valinge representatives noted that Trotter did not teach a "strip extending substantially an entire length of the joint edge or the mutual displacement features of the claims." <u>Id.</u> at 7.  The following day, April 21, the Examiner did, in fact, issue a rejection of, <u>inter alia</u>, claims 21 and 31 for obviousness based on Trotter.  In so doing, the Examiner stated that Trotter disclosed "use of a joint between building panels…such that a play exists…to enable mutual displacement of the panels."  <u>Id.</u> at 46.  Trotter therefore "discloses that basic claimed joint arrangement

---

[4] The facts regarding this interview are drawn from an interview record prepared by Valinge's attorney.

except for the strip being integral with the second edge of the panel," which the Examiner found to be an obvious variation. Id.

At some point after the obviousness rejection, the Examiner apparently informed Valinge that the rejection would be withdrawn and superseded by a different Office Action.[5]  In any event, on June 15, 2005, the Examiner rejected, inter alia, claim 21 for double-patenting over claims 39, 41, 49 and 50 of the '410 patent.  The Examiner stated that the '410 patent and the '621 reissue application covered "common subject matter," and in her description of that subject manner included that "a play exists between the locking groove and a locking surface on the locking element." Id. at 38. Valinge filed another Terminal Disclaimer to cure the double-patenting objection, and on October 11, 2005, the Examiner issued a supplemental notice of allowability of the '621 reissue patent claims, without any statement of reasons.

### CLAIMS POTENTIALLY INCORPORATING PLAY

The parties offer conflicting constructions of a number of terms covering all three asserted patents which turn on whether the claims incorporate a play limitation. The claim terms potentially incorporating play are "second mechanical connection" and "sufficient space within the locking groove" in claims 21 and 31 of the '621 reissue patent, "second mechanical connection" and "to prevent substantial separation of the joined first and second panels" in claims 10 and 22 of the '579 patent, and "first locking member" and "second locking member" in claim 1 of the '907 patent.

## I. Deference to the Federal Circuit's Decision in __Alloc v. ITC__

Before construing the aforementioned patent claims, the Court must decide what weight to afford the Federal Circuit's constructions of the Pervan patents in

_____

[5] The record does not contain that communication.

Alloc v. ITC.  In its 1996 decision in Texas Instruments v. Cypress Semiconductor Corp., the Federal Circuit ruled that ITC decisions and Federal Circuit decisions on appeal from the ITC, including claim construction decisions, had no preclusive effect in subsequent actions involving identical patent claims. 90 F.3d 1558, 1569 (Fed. Cir. 1996).  As to the ITC determinations, the "district court can attribute whatever persuasive value to the prior ITC decision that it considers justified." Id.  The status of Federal Circuit decisions on appeal from the ITC is less clear, however.  The Texas Instruments court's sole statement regarding the weight a district court should give to such decisions was that "[d]istrict courts are not free to ignore holdings of this court that bear on cases before them."  A modicum of guidance may also be drawn from the court's suggestions regarding subsequent Federal Circuit panels, however, which are "similarly not free to ignore precedents set by prior panels of the court." Id.  The court clarified that "to the extent that we have previously ruled on a matter, a subsequent panel will have powerful incentives not to deviate from that prior holding, short of thoroughly justified grounds." Id.

Few courts have had occasion to opine on the meaning of the Texas Instruments standard concerning Federal Circuit rulings in ITC appeals; the Court's research has unearthed only three, one of which addressed the issue only hypothetically. See Fuji Photo Film Co. Ltd. v. Jazz Photo Corp. Inc., 173 F.Supp.2d 268 (D.N.J. 2001) (considering prior Federal Circuit rulings on appeal from ITC); Minnesota Mining and Mfg. Co., Inc. v. Beautone Specialties Co., Ltd., 117 F.Supp.2d 72 (D.Mass. 1999) (same); Thomson Consumer Electronics, Inc. v. Innovatron, S.A., 3 F.Supp.2d 49 (D.D.C. 1998) (allowing discovery beyond that produced in parallel action pending

before ITC).  Nor do these three courts clarify the issue; each sets forth a different approach to considering such Federal Circuit rulings.  At the one extreme, the court in Thomson Consumer Electronics suggested that the Federal Circuit's rulings would "certainly have a pronounced effect, and in practical terms the stare decisis effect of appellate review of the ITC construction would have near-preclusive effect with respect to any review of this Court's construction."  Thomson Consumer Electronics, 3 F.Supp.2d at 51.  At the other end of the spectrum,  the court in Fuji Photo Film asserted that the rulings and findings of the ALJ, ITC, and Federal Circuit alike "do not receive any deferential treatment," and the court "render[ed] its opinion based on an independent review of the facts and law."  Fuji Photo Film, 173 F.Supp.2d at 274.  Finally, in Minnesota Mining the court took something of a middle ground, holding that while the Federal Circuit rulings had no preclusive effect, the court was obligated to "construe the [patent] claims…against the background of these earlier proceedings."  Minnesota Mining, 117 F.Supp.2d at 83.  It is worth noting that despite the differing rhetoric, even in Fuji Photo Film the court did not deviate in practice from the prior Federal Circuit rulings.

   Considering Federal Circuit claim construction rulings in ITC appeals merely for their persuasive value is inconsistent both with the clear thrust of Texas Instruments and with the general goals of the patent law.  The mild deference suggested by Minnesota Mining is similarly inadequate.  Despite a certain lack of clarity, Texas Instruments strongly suggests that future Federal Circuit panels should not deviate from prior rulings except on "thoroughly justified grounds."  At a minimum, what is a suggestion to future Circuit panels must be understood as a command to the district

courts.  Given the greater authority and capacity of the Federal Circuit, a district court should accord prior rulings *more* deference than would a subsequent Circuit panel.

This conclusion is supported by "the importance of uniformity" relied on by the Supreme Court in holding claim construction to be entirely an issue of law for the court to determine.  <u>Markman</u>, 517 U.S. at 391.  The Court hoped that legal conclusions as to claim construction would promote certainty through <u>stare</u> <u>decisis</u> even where issue preclusion did not apply.  As the Court noted, the Federal Circuit was created precisely to ensure consistent ruling on patent scope, preventing a "zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims." <u>Id.</u> (quoting <u>United Carbon Co. v. Binney & Smith Co.</u>, 317 U.S. 228, 236 (1942)).  When inventors and entrepreneurs may not rely on the Federal Circuit's own determination of the limitations of an existing patent, just such a "zone of uncertainty" exists.  Deviation from Federal Circuit findings should therefore be considered only under unusually compelling circumstances.

This conclusion is bolstered by the lack of certainty that district court determinations of claim construction have historically provided.  As numerous empirical studies have shown, since <u>Markman</u> the Federal Circuit has reversed district court claim construction decisions at a remarkable rate. <u>See</u>, <u>e.g.</u>, Kimberly A. Moore, <u>Markman Eight Years Later: Is Claim Construction More Predictable?</u>, 9 Lewis & Clark L. Rev. 231, 239 (2005) (finding that the Federal Circuit modified at least one claim construction ruling in 37.5% of cases and found that 34.5% of the total claim terms were wrongly construed by the district court from the <u>Markman</u> decision in 1996 through 2003); Christian A. Chu, <u>Empirical Analysis of the Federal Circuit's Claim Construction Trends</u>,

16 Berkeley Tech. L.J. 1075, 1104 (2001) (finding that the Federal Circuit modified the

district court's claim interpretation in 44% of cases from 1998 to 2000); Gretchen Ann

Bender, Uncertainty and Unpredictability in Patent Litigation: The Time is Ripe for a

Consistent Claim Construction Methodology, 8 J. Intell. Prop. L. 175, 207 (2001)

(finding that the Federal Circuit modified the district court's claim interpretation in 40%

of cases from Markman through 2000).  Given these figures, it is difficult for a potential

litigant to put faith in a district court's finding of patent scope.  Even beyond the serious

reliance and uniformity issues presented by the statistical pattern, the simple fact of the

district courts' susceptibility to errant claim construction counsels that they should

substitute their own judgment for that previously expressed by the Federal Circuit with

the greatest trepidation.

      In sum, the proper interpretation of Texas Instruments in the claim

construction context is that a district court should afford Federal Circuit claim

interpretation on appeal from the ITC a strong presumption of correctness, and deviate

only where the party advancing an alternative interpretation provides compelling reasons

to do so.  Such reasons might include evidence or arguments not presented to the Circuit

panel or, in the rarest of cases, plain error on the face of the Federal Circuit opinion.

Having established the appropriate degree of deference, the Court now turns to the

Federal Circuit's findings in Alloc v. ITC.

## II. Adoption of the Alloc v. ITC Findings

      The relevant ruling by the Federal Circuit in Alloc is that all asserted

claims of the '621 and '907 patents necessarily include a play limitation.  This ruling is

based on two separate findings: (1) that the common Pervan specification "read as a

whole leads to the inescapable conclusion that the claimed invention must include play in every embodiment;" and (2) that Plaintiffs "expressly disavowed systems without play during prosecution of the parent '621 application." <u>Alloc</u>, 342 F.3d at 1370, 1372. Absent compelling reason to deviate from the Federal Circuit's findings, the Court must construe the relevant claim terms as incorporating a play limitation.

To defeat this presumption of correctness, Plaintiffs argue that the prosecution history of the '621 reissue patent subsequent to the <u>Alloc</u> decision shows that play is a limitation only on those patent claims in which it is expressly stated. Plaintiffs rely on their repeated statements during the reissue proceeding that they intended '621 reissue claims 21-23, and by implication claim 31, to contain no play limitation, and on the Examiner's allowance of those claims without making a statement that the allowed claims included such a limitation. Plaintiffs essentially argue both that the reissue history reveals that the <u>Alloc</u> court erred in finding a disavowal of non-play systems during the original '621 prosecution, and in the alternative that the reissue proceeding supersedes any prior disavowal. If Plaintiffs are to succeed on either contention, the evidence from the '621 reissue proceeding must also be so clear as to overcome the <u>Alloc</u> court's finding that the specification alone requires play. Plaintiffs' arguments are unpersuasive, and, accordingly, the Court adopts the findings of <u>Alloc</u>.

## A. The '621 Reissue History Does Not Justify Deviation from <u>Alloc</u>

A patent's prosecution history during a reissue or re-examination proceeding is part of the intrinsic evidence of claim meaning, just as is the original prosecution history, and "[r]epresentations made and explanations presented during the reissue procedure may be relevant to interpretation of the claims." <u>Fromson v. Anitec</u>

Printing Plates, 132 F.3d 1437, 1443 (Fed. Cir. 1997) (abrogated on other grounds by

Cybor Corp. v. FAS Technologies, Inc., 138 F.3d 1448 (Fed. Cir. 1998)).  The '621

reissue history was, however, neither complete nor before the court in Alloc.  Plaintiffs'

argument is therefore properly based on new evidence not presented in Alloc.

       Plaintiffs' assertions are, however, undercut by three separate

considerations.  First, the reissue history is plainly insufficient to undermine the finding

of a disavowal of non-play systems during the original '621 prosecution.  Second, the

reissue history is, at most, ambiguous on the question of whether a play limitation applies

to the '621 reissue claims.  Third, even if the reissue prosecution history weighed in

Plaintiffs' favor on this point, the recapture rule would bar such an expansion of claim

scope in reissue proceedings, and the Court would be obliged to construe the claims to

avoid the recapture rule's prohibitions.

### The Reissue History Is Consistent with a Disavowal of Non-Play Systems

       The reissue history contains no meaningful evidence casting doubt on the

Alloc court's determination that Plaintiffs disavowed non-play systems during the

original prosecution of the '621 patent.  Prior to the issuance of the decision in Alloc, the

reissue history contains no statements by Plaintiffs suggesting a belief that non-play

systems were covered by the patent.  The first of Plaintiffs' statements indicating an

intent that non-play systems be included was not made until January 8, 2004, months

after the decision in Alloc.  It is, therefore, merely a self-serving disclaimer of intent to

disavow non-play systems of precisely the kind made to the Alloc court.  These

statements are not in any sense new evidence, and the point they stand for was plainly

considered and rejected in Alloc.

Statements by the Examiner prior to <u>Alloc</u> similarly do not support Plaintiffs' argument. While the Examiner's description of the invention claimed by the '621 reissue patent in her initial notice of allowability does not mention play, it does focus on the displacement feature found by the <u>Alloc</u> court to require play. Moreover, the initial notice bears little weight given the intervening re-examination proceeding. The Examiner's first double-patenting rejection, on the other hand, expressly states that the both the relevant '621 reissue claims and claims 1 and 2 of the '579 patent were directed towards a system that included play.

In sum, the reissue history is completely insufficient to show that the <u>Alloc</u> court erred in finding a disavowal of non-play systems, and the Court will therefore adhere to that finding in this matter.

### *The Reissue History is Ambiguous as to the Existence of a Play Limitation*

The reissue history also fails to demonstrate that the '621 patent was reissued without a play limitation, thereby superseding Plaintiffs' original disavowal, due to its fundamental ambiguity on the essential point. This ambiguity begins with the request for reissue itself, which does not address a play limitation or lack thereof. Thereafter the record reveals five relevant actions by the Examiner. The first two, already discussed, are of questionable relevance as they precede Plaintiffs' statement of intent. If anything, however, they tend to show that the Examiner believed a play limitation existed in all the '621 patent claims.

The crucial portion of the prosecution history is the period after Plaintiffs' statement of intent, first made on January 8, 2004. This period is not notably helpful to Plaintiffs' position. Both the obviousness rejection based on Trotter and the second

double-patenting rejection occurred after Plaintiffs' statement of intent, and both

rejections stated that the '621 reissue claims cover a system that includes play.  The

Trotter rejection may be less probative because it was voluntarily withdrawn by the

Patent Office.[6]  The second double-patenting rejection, however, was cured only by a

terminal disclaimer filed by Plaintiffs.  While Plaintiffs are correct that a terminal

disclaimer does not estop them from contesting the correctness of the Examiner's

position, see Quad Environmental Tech. Corp. v. Union Sanitary Dist., 946 F.2d 870, 874

(Fed. Cir. 1991), it does indicate that the Examiner maintained her position throughout

the reissue proceeding; had she reconsidered, the rejection would have been withdrawn

without the need for a terminal disclaimer.

             The Examiner's final action was, naturally, a notice of allowability.  This

did not include a statement of reasons for allowance, and therefore clearly did not state a

disagreement with Plaintiffs' interpretation of the claims, as requested in Plaintiffs'

statement of intent.  Plaintiffs' statements did not request that the claims be allowed only

on a non-play basis, however, but rather that the Examiner inform Plaintiffs if the claims

were being allowed with a play limitation incorporated.  The lack of *any* statement of

reasons, therefore, weakens any inference that the Examiner was acceding to Plaintiffs'

interpretation.  The Federal Circuit has previously cautioned against precisely the practice

of inferring agreement with a patentee's interpretations from an Examiner's silence.  See,

e.g., Prima Tek II v. Polypap, 318 F.3d 1143, 1151 (Fed. Cir. 2003); DeMarini Sports,

Inc. v. Worth, Inc., 239 F.3d 1314, 1326 (Fed. Cir. 2001).  Moreover, the Examiner's two

---

[6] The Court notes that this withdrawal may have been based on Plaintiffs' argument to the Patent Office
that a rejection based on Trotter had already been withdrawn during the original '621 prosecution.  As the
Alloc court determined, the withdrawal of that earlier rejection was based in part on the surrender of non-
play claims by Plaintiffs.

rejections referencing play filed after Plaintiffs' statement of intent could certainly be considered responsive to Plaintiffs' request that the Examiner indicate any disagreement with Plaintiffs' interpretation "in her reasons for allowance *or otherwise*."  PH at 132 (emphasis added).

Plaintiffs attempt to evade this conclusion by arguing that the Examiner's references to play merely meant that the '621 reissue patent as a whole covers a floor board system with play, not that it *only* covers such a system, or that *all* the reissue claims include play.  This reading of the Examiner's statements is not notably persuasive; it is certainly not definitive.  At best, the Examiner's actions are ambiguous, which renders the Examiner's understanding of the allowed claims ambiguous.  In light of this ambiguity, the reissue history cannot outweigh the specification's teaching of a play limitation and Plaintiffs' original disavowal of non-play systems.  Certainly it cannot constitute compelling contradictory evidence, and the Court will therefore abide by the holding of Alloc that the '621 patent claims require play.

### The Recapture Rule

Even if the reissue history provided more substantial support for Plaintiffs' position, the Court would still have to consider the effect of the recapture rule on the proper construction of the claim terms.  The recapture rule limits the ability of patentees to broaden patent claims during reissue proceedings.  "Under the recapture rule, claims that are broader than the original patent claims in a manner directly pertinent to the subject matter surrendered during prosecution are impermissible." Hester Indus., Inc. v. Stein, Inc., 142 F.3d 1472, 1480 (Fed. Cir. 1998) (internal quotation omitted).

To determine whether the recapture rule applies, the Court first assesses whether a reissue claim is broader than the original patent claims. Id.  Because a claim "that does not include a limitation present in the original patent claims is broader," id., interpreting the '621 reissue claims as lacking a play limitation would make them broader than the original claims which, as noted, incorporated such a limitation.  The second step of the analysis is a determination of whether the broader aspects of the reissue claims were surrendered during the original prosecution. Id.  As a central finding in Alloc, this too has been conclusively demonstrated.  Finally, the Court must determine whether the reissue claims are materially narrower than the original claims in some other respect, thereby avoiding the application of the recapture rule. Id.  That is clearly not the case here, where the reissue proceeding addressed only expansions of the patent claims.  Accordingly, the Court must find that the recapture rule would invalidate the '621 reissue claims if they were construed to cover non-play applications.

The Federal Circuit has recently held, however, that the recapture rule is addressed solely to the validity of patent claims, and may not be used to "rewrite the claims, essentially unmaking the change that the PTO had permitted."  MBO Laboratories, Inc. v. Becton, Dickinson & Co., 474 F.3d 1323, 1332 (Fed. Cir. 2007).  The court clarified, however, that this proscription does not apply to circumstances where the meaning of the reissue claims is ambiguous:

> This is not to say that the recapture rule may never properly factor into claim construction. In a case where the available techniques of construction yield two possible interpretations of a reissue claim, only one of which includes previously surrendered matter, it would be correct to resolve the ambiguity by selecting the interpretation not barred by the recapture rule.

Id. at 1332 n.3.  As noted, adopting the interpretation of the '621 reissue prosecution history that is most favorable to Plaintiffs, while remaining plausible, still leaves it ambiguous as to whether a play limitation is incorporated in the relevant terms.

This ambiguity distinguishes the present case from MBO Laboratories, where "MBO clearly sought in reissue to broaden the scope of its patent coverage by rewriting its claims" because the "broadening was the explicitly stated purpose of the reissue application." Id. at 1332.  Here, the requested broadening of scope was not the stated purpose of the reissue application, and the request expressly anticipated the possibility that the Examiner could allow the reissue patent claims without Plaintiffs' broadened interpretation.[7]  The prosecution history cannot be said to eliminate a play limitation as a "possible interpretation" of the claims when considered along with the specification as interpreted in Alloc, and the Court is therefore obliged to select the construction not barred by the recapture rule, and construe the relevant claims as incorporating a play limitation.

**B. '621 Reissue Patent Claims Incorporating Play Under Alloc**

Having established that all asserted claims of the '621 reissue patent must incorporate play, the Court now turns to construe the relevant claim terms.

*"second mechanical connection"*

The teachings of the Pervan specification make clear that the relevant play is "operative" in the "second mechanical connection."  '621 reissue patent, col. 4, lns. 10-14.  Therefore it is appropriate to incorporate the necessary play limitation into the claim term "second mechanical connection" in claims 21 and 31 of the '621 reissue patent.

---

[7] Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898 (Fed. Cir. 2004), on which Plaintiffs rely, is distinguishable on similar grounds.  It is also inapplicable because it addressed statements of intent during the original prosecution, rather than during reissue after a disavowal during the original prosecution.

Defendants' proposed construction, incorporating play, is largely consistent with the
description provided by the rest of the claim language and the specification:

> the locking element is inserted into the locking groove such that two
> panels are joined in the direction parallel to the principal plane of the
> panels and at right angles to the joined edges, with a play of at least 0.2
> mm in that direction.

This construction departs from the description provided by the claim language only in its
requirement that the play be at least 0.2 mm. Defendants draw this limitation on the
amount of play from the specification, which at one point states that "disassembly can be
achieved even if the aforementioned play…is not greater than 0.2 mm." Id. at lns. 22-24.

         This improperly reads a limitation into a claim term from the specification.
While the inclusion of some amount of play is required by the full scope of the
specification, and is essential to the claimed invention as a whole, the 0.2 mm minimum
amount of play is mentioned only once and in the context of one preferred embodiment.
"[W]hen a claim term is expressed in general descriptive words, [the court] will not
ordinarily limit the term to a numerical range that may appear in the written description
or in other claims." Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1249
(Fed. Cir. 1998). There is no claim language supporting such a minimum amount of
play, and this is not an instance where the inventor's intention to define play with such a
minimum was clearly expressed. See Conoco, 460 F.3d at 1357-58. It would therefore be
inappropriate to construe the claim language to require such a minimum. See Phillips,
415 F.3d at 1323.

         The Court therefore rejects that aspect of Defendants' proposed
construction, and adopts the definition of the play within the second mechanical

connection set forth in the specification.  The Court construes "second mechanical connection" to mean:

> the locking element is inserted into the locking groove such that two panels are joined in the direction parallel to the principal plane of the panels and at right angles to the joined edges, and a play exists between the locking groove and the locking surface of the locking element that is facing the joined edges.

### *"sufficient space within the locking groove"*

Claim 31 of the '621 reissue patent states that when the locking element is received within the locking groove, "there is sufficient space within the locking groove to allow mutual displacement of the panels…."  Defendants propose that "sufficient space" be construed to mean at least 0.2 mm.  As indicated, however, the Court will not incorporate that limitation into the claim language.  The ordinary meaning of the claim language is quite clear: the space must be large enough to allow the panels to be displaced as stated in the rest of the claim.  To the extent there is any plausible question regarding the meaning of "within the locking groove," the Court construes the term to mean "sufficient space between the locking groove and the locking element…."

## C. '907 Patent Claims Incorporating Play Under <u>Alloc</u>

As noted above, claim 1 of the '907 patent was before the court in <u>Alloc</u>, and so play must be incorporated into that claim.  Defendants urge that play be read into the claim terms "first locking member" and "second locking member" by construing them as "means-plus-function" claim elements under 35 U.S.C. § 112 ¶ 6.  The <u>Alloc</u> court specifically declined to decide whether § 112 ¶ 6 was applicable to these claim terms, finding that play was incorporated regardless.

The Court finds that § 112 ¶ 6 does not apply to "first locking member" and "second locking member." When a claim term does not use the word "means," as these claim terms do not, there is a strong presumption, "not readily overcome," that § 112 ¶ 6 does not apply. Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1358 (Fed. Cir. 2004). That presumption may be rebutted by a showing that the claim term does not "recite[] sufficiently definite structure" or recites "function without reciting sufficient structure for performing that function." Watts v. XL Sys., Inc., 232 F.3d 877, 880 (Fed. Cir. 2000). Notwithstanding this exception, the Federal Circuit has only applied § 112 ¶ 6 in one published opinion where the term "means" was not used. Lighting World, 382 F.3d at 1362.

Unsurprisingly, Defendants rely on that one case, Mas-Hamilton Group v. LaGard, Inc., 156 F.3d 1206 (Fed. Cir. 1998). Mas-Hamilton is readily distinguishable, however. There, the court found that the terms "lever moving element" and "movable link member" had no well-understood meaning in the art, that the prosecution record showed that the patentee had used "means" interchangeably with "element" and "member," and that the patent itself described the terms as the "means…for" the relevant functions. Mas-Hamilton, 156 F.3d at 1214-15. The court also noted that "movable link member" was followed directly by claim language explaining two required functions of the member. Id. at 1215. While Defendants have presented expert testimony to the effect that "locking member" has no well-understood meaning in the art, there is no other evidence, comparable to that in Mas-Hamilton, to suggest that "member" here is merely a proxy for "means." Nor does any functional language follow the claimed terms.

The '907 claim terms are far more analogous to the "connector assembly" addressed by the Federal Circuit in Lighting World.  The court there relied on various definitions of connector to find that the claim term "means a unit that joins, fastens, or links each pair of adjacent support members." Lighting World, 382 F.3d at 1361. The court further noted that "[t]he fact that more than one structure may be described by that term, or even that the term may encompass a multitude of structures, does not make the term 'connector assembly' any less a name for structure." Id.  "Locking member" is clearly comparable to "connector assembly;" if the latter is a sufficiently definite structure, then so is the former.  § 112 ¶ 6 does not apply.

The Court therefore construes both "first locking member" and "second locking member" as independent structural claims.  Webster's Third New International Dictionary 1408 (2002) defines "member" as, inter alia, "a constituent part of a whole." In light of the other claim language and the specification, the Court agrees with Plaintiffs that an ordinary person skilled in the art would read "locking member" to mean a "structure that is part of a locking connection."  "First" and "second" are given their ordinary meaning.  The Court finds that the play limitation is not properly read into either "first locking member" or "second locking member" but is more appropriately incorporated into the term "connected" in column 10, line 48 of claim 1 of the '907 patent.  That term, like "second mechanical connection" in the '621 reissue patent, describes the relationship between the locking members in which the play occurs.[8]  The Court therefore construes "connected" as "connected such that a play exists between the

---

[8] While the parties did not present proposed constructions for "connected" in this claim, or brief the question directly, the Court believes that the parties briefing and argument on the overall claim language and the play issue was more than adequate to allow the Court to proceed with this alternative construction.

first locking member and the locking surface of the second locking member that is facing the joined edges."

**III. The '579 Patent and Play**

The '579 patent was not before the court in <u>Alloc</u>, and so its claims were not directly construed. Nevertheless, the intrinsic evidence of the '579 patent, informed by the underlying findings of <u>Alloc</u>, show that claims 10 and 22 of the '579 patent claims incorporate the same play limitation as the other Pervan patents. This limitation applies notwithstanding the absence from the claim language of play, displacement, or disassembly.

**A. Incorporation of Play in the '579 Patent**

The common Pervan specification included in the '579 patent, taken as a whole, "leads to the inescapable conclusion that the claimed invention must include play in every embodiment." <u>Alloc</u>, 342 F.3d at 1370. This finding is not dependent on the aspects of the specification which relate to displacement and disassembly. The specification describes the claimed invention as including play, suggesting that all claims must include play, regardless of claim language referencing displacement and disassembly. Similarly, the fact that all figures and embodiments disclose play supports the <u>Alloc</u> court's finding.

The language of the asserted '579 patent claims confirm that the play limitation, discussed in the specification generally, applies here specifically. Claims 10 and 22 both claim a "second mechanical connection" that locks two edges together using a locking element and a locking groove. As noted previously, the description of the claim invention in the specification makes clear that play is "operative" in the second

mechanical connection.  That statement does not refer to the second mechanical connection in a preferred embodiment, but rather to its functioning in the claimed invention as a whole.  Furthermore, both claims recite that the locking element "is configured so as to contact the internal surface of the locking groove when the first and second edges are joined together *to prevent substantial separation of the joined first and second edges*." '579 patent, col. 11, lns. 61-65 (emphasis added).  By claiming a locking element which prevents a "substantial separation," the '579 patent clearly implies that the locking element is positioned to allow *non-substantial* separation of the edges.  Such non-substantial separation in turn implies that play exists between the locking element and locking groove.  The language of the claims read in light of the specification therefore requires play.

While the prosecution history of the '579 patent casts no light on this question, the reissue prosecution history of the '621 patent provides additional support for the existence of a play limitation in the asserted claims.  During the '621 reissue proceeding, the Examiner's first double-patenting objection stated that claims 1 and 2 of the '579 patent were directed towards systems with play.  Claims 10 and 22 are identical to claim 1 in all respects relevant to the existence of a play limitation.  Plaintiffs are correct that the Examiner's action can be interpreted to mean that claims 1 and 2 together covered flooring systems with play based on an explicit play limitation in claim 2, leaving claim 1 covering non-play systems.  This interpretation requires a strained reading of the Examiner's action, however.  The plain, obvious reading of that action supports a determination that claim 1, and by implication claims 10 and 22, incorporates a play limitation.

Plaintiffs argue that the evidence just considered is outweighed by the doctrine of claim differentiation. They point to the fact that claim 11 is dependent on claim 10 with the added limitation of "a small play," and assert that claim 10 must therefore be construed to have no play limitation. "A small play" is not, however, equivalent to "play." Indeed, the term "a small play" is used in the specification only in regards to a particular preferred embodiment of the invention, while "play" is used in describing the invention as a whole. The specification indicates, therefore, that the "small play" in claim 11 is an additional limitation, beyond the general play limitation incorporated in claim 10. Moreover, the Court notes that the doctrine of claim differentiation was also invoked and rejected in <u>Alloc</u> based on the contrary weight of the intrinsic evidence. Similarly, the Court believes that even if claim differentiation created a presumption that play was not incorporated in claim 10, the remainder of the intrinsic evidence would rebut that presumption. The Court therefore finds that claims 10 and 22 of the '579 patent incorporate play, and turns to the construction of the relevant claim terms.

**B. Claim Terms Incorporating Play**

The disputed terms in the '579 patent claims that include or reflect play are "second mechanical connection" and "to prevent substantial separation of the joined first and second panels." The Court now construes those terms as follows:

### *"second mechanical connection"*

The Court has already construed the term "second mechanical connection" in the context of the '621 reissue patent. As noted above, the Court finds that this term incorporates a play limitation in claims 10 and 22 of the '579 patent just as it does in the

'621 reissue patent.  Moreover, the claim language does not suggest any other differences in meaning between the use of the term in the each of the patents.  The Court therefore construes "second mechanical connection" to have an identical meaning in both patents.

### *"to prevent substantial separation of the joined first and second panels"*

The Court finds that it is unnecessary to construe this term, as it bears its plain and ordinary meaning.  Defendants' proposal that the "substantial separation" be read as "substantially greater than 0.2 mm" is rejected for the reasons previously given by the Court.

## CLAIMS NOT INVOLVING PLAY

Having construed the claim terms for which play was a potential issue, the Court now turns to the remaining claim terms.

### I. The '621 Patent

The sole remaining claim term of the '621 reissue patent in dispute is "a locking element projecting from the strip" in claims 21 and 31.  The Court believes this term essentially bears its ordinary meaning.  To relieve any possible confusion regarding the meaning of "projecting," the Court construes it to mean "sticking up" based on the clear import of claim language and specification.  The claim term is therefore construed to mean "a locking element sticking up from the strip."

Defendants propose a construction requiring the locking element to extend at a right angle and to have a height of at least 0.5 mm.  Both of these requirements are drawn from discussion in the specification of the figures or preferred embodiments, and are not central to the claimed invention.  For the reasons discussed above in connection with Defendants' proposed minimum amount of play, the Court rejects this construction.

**II. The '579 Patent**

The remaining disputed claim terms of the '579 patent are "internal surface," "locking surface which faces the first edge," and "a locking element projecting from the strip" in both claim 10 and claim 22, and "upper decorative wear layer" in claim 22 only.  "A locking element projecting from the strip" was just construed as used in the '621 reissue patent, and the parties have provided no reason why a different construction would apply in the context of the '579 patent claims.  Therefore that term is construed as discussed above.  The Court now construes the other claim terms.

*"internal surface"*

The Court finds that the "internal surface" of the locking groove means simply "the surface of the locking groove that is closest to the tongue," based on the ordinary meaning of the term in the context of the remainder of the claim language. Defendants' request to construe the term as requiring the "internal surface" be at a right angle to the primary plane of the joined panels is rejected for the reasons discussed in regards to "a locking element projecting from the strip."

*"locking surface which faces the first edge"*

The Court finds that the ordinary meaning of this claim term applies and is self-explanatory.  The Court therefore declines to construe it further.  Defendants proposed constructions regarding a right angle and minimum height are rejected for the reasons previously discussed.

*"upper decorative wear layer"*

The claim term "upper decorative wear layer" should be similarly obvious in meaning, but given the tortured constructions proposed by the parties, the Court is

obligated to construe it. By its plain terms, "upper decorative wear layer" refers to a

single layer, subject to wear, that is decorative. Plaintiffs' suggestion that "layer"

actually means "layers" defies the plain meaning of the claim language, and is therefore

rejected. The surrounding claim language also dispels any doubt that "upper" refers to

the surface layer of the panel. The Court therefore construes the term to mean "a single

surface layer that is subject to wear and contains decorative features."

## CONCLUSION

The foregoing constitutes the Court's rulings on all outstanding issues of

claim construction.

Dated: New York, New York
       July 18, 2007

SO ORDERED

PAUL A. CROTTY
United States District Judge

Copies e mailed By Chambers On: 7/18/07
By: Marlon Ovalles, C.R.D